UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ON24, INC.,<br><br>   Plaintiff,<br><br>  v.<br><br>WEBINAR.NET, INC.,<br><br>   Defendant. | Case No. 21-cv-07721-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Docket No. 70 |

  Plaintiff ON24, Inc. has filed suit against Defendant webinar.net, Inc., asserting a variety of business torts, including patent infringement. Now pending before the Court is webinar's motion for partial summary judgment on the patent infringement claim. According to webinar, the patent at issue – the '480 patent – is invalid based on indefiniteness. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** webinar's motion.

## I.  FACTUAL & PROCEDURAL BACKGROUND

  ON24 has asserted the following causes of action against webinar:

  (1) Infringement of ON24's '480 patent.

  (2) Interference with contractual relations between ON24 and its customers.

  (3) Unfair competition.

  (4) Violation of the Lanham Act by making false or misleading representations about ON24.

The pending motion for partial summary judgment focuses on the patent infringement claim only.

  ON24's '480 patent is titled "Communication Console with Component Aggregation."

1   The field of the invention is online communications applications. *See* '480 patent, col. 1:14-15.

2   The abstract for the patent describes the invention at issue as follows:

> Systems methods and devices are provided for a presentation including a communications console with component aggregation. In one potential implementation, a computing device with an application framework receives a communication manager object via a network connectivity device and executes the communication manager object within the application framework. The computing device may then receive and execute communications components and a presentation component[] within the application framework using the communication manager object. The communication manager object may then manage interface and display of the presentation information via the application framework, as modified by communication components.

'480 patent, abstract; *see also* Overby Decl. ¶ 21 (stating that there are four main components: "(1) the 'presentation component,' which is the main presentation (*e.g.*, a speaker's video stream); (2) the 'communications components,' which are audio-visual add-ons to the presentation (*e.g.*, a slide show, a Twitter feed, a menu ribbon); (3) the application framework, where the user interacts with the first two components (*e.g.*, the user's browser); and . . . (4) the 'communication manager object,' which manages the two components so they work seamlessly on the application").

As background, the specification for the patent acknowledges that there are "numerous structures . . . for direct online communications" but notes that

> [t]he current solutions for providing interactivity and user control . . . are limited in the amount of user control that they provide for an audience member. These online communications applications limit flexibility, integration, and user selections in a variety of ways in order to streamline and limit the size and complexity of the application.
>
> For example, current direct online applications limit flexibility by restricting the amount of customization that can be achieved within an individual communications component. None of the existing direct online platforms use a completely separate, encapsulated architecture for implementing communications component customization per webcast, and none of them allow an audience member to set up and view a webcast per their own interests. They also limit integration by restricting the amount of interactivity provided to a highly-customized communications. For example, existing webcasting platforms do not have an open platform for integrating third-party communications components of any significant size or complexity. The integration of third-party communications components in communication applications are limited in direct communications to simple image or animation

>components. Attempts to expand flexibility in current solutions involve creation of a collection of closed "widgets" which become the non-expandable limitations of the application.
>
>Downloaded executable installed applications do exist currently that use a component model, but the requirement to download, execute, and install a desktop executable application in a client computer make the current use of these indirect executable applications less secure and more cumbersome from an initial use perspective. None of the existing applications function in a context that is fully-online, without a downloaded desktop application.

'480 patent, col. 1:19-54; *see also* Overby Decl., Ex. H (in a decision on a petition brought by webinar against ON24, PTAB stating that "[t]he '480 patent addresses the problem of customizing webcast presentations by being 'fully online' without the need for a separate downloaded desktop application").

A representative independent claim for the '480 patent is as follows:

>1. An audience computing device comprising:
>
>    a processing device;
>
>    a memory device;
>
>    an application framework that receives a **communication manager object** via a network connectivity device and executes the **communication manager object** within the application framework;
>
>    wherein the application framework receives and executes at least two communications components and a presentation component within the application framework using the **communication manager object** and each component exchanges data with the **communication manager object** within the application framework during a presentation to present the presentation to a user of the audience computing device without downloading and installing an application, and the **communication manager object** manages interface and display of the presentation via the application framework; and
>
>    wherein the communication components are at least two of a slide communications component, a media communications component and a menu ribbon component, each of the communication components comprises graphical interface information, and the **communication manager object** automatically modifies the graphical interface information to a standardized interface format.

'480 patent, claim 1 (emphasis added).

As reflected by the bolded language above, the key term in dispute at summary judgment is "communication manager object." webinar takes the position that "communication manager

3

object" is an indefinite term.

"Communications manager object" is discussed in the specification in column 4.

> The complex interaction within the various components is managed by a central "Communications Manager" object, which registers events or requests from individual components, identifies the priority of each event, and determines the callback mechanism to deliver information back to the calling component.  This object then applies a layer of security filters to verify that the calling component has the appropriate permissions to access the resources it is requesting, and that it has not exceeded its quota of requests within a given time frame.  Once all these filters are passed and the Communications Manager determines that the event or method being called can in fact be acted on – the event or method is allowed to proceed in a metered and organized way.  Registered event listeners, or method calls return the information to the component via a callback method, including the requested information, if any, and status of the original request.  In this way, the platform enables the limited resources available on the browser to be allocated with the appropriate priority and rationing so as to allow for a smooth, seamless, and integrated user experience.  Contrast this organized platform approach with a mashup of components – each unaware of the other, and each competing for the limited resources available to the browser (CPU, threads, number of concurrent request to the back-end systems available, etc.), degrading performance in unpredictable and undesirable ways.

'480 patent, col. 4:24-48.

## II.     DISCUSSION

A.     Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

In the instant case, patent invalidity is an affirmative defense.  webinar, as the alleged infringer, has the burden of proving that defense.  *See Impax Labs., Inc. v. Aventis Pharm., Inc.*,

4

1   468 F.3d 1366, 1378 (Fed. Cir. 2006) ("An issued patent is presumed to be valid, and the burden

2   of establishing invalidity as to any claim of a patent rests upon the party asserting such

3   invalidity.").  "Clear and convincing evidence is required to invalidate a patent."  *Id.*  "When

4   evaluating a motion for summary judgment, the court views the record evidence through the prism

5   of the evidentiary standard of proof that would pertain at a trial on the merits."  *Eli Lilly & Co. v.*

6   *Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

### B.      Law on Indefiniteness and Means-Plus-Function Claims

The Supreme Court has held that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see also* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").[1]  Indefiniteness is a question of law.  *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015); *see also ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). ("[I]ndefiniteness is a question of law and in effect part of claim construction.").

In the instant case, webinar claims indefiniteness based on its assertion that the term "communication manager object" is a means-plus-function term.  Title 35 U.S.C. § 112(f) covers means-plus-function claims.  It provides as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function *without* the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the *corresponding structure, material, or acts described in the specification* and equivalents thereof.

35 U.S.C. § 112(f) (emphasis added).[2]  If there is, in fact, a means-plus-function term, then the first step in construing that term is to "'identify the claimed function.'"  *Rain Computing, Inc. v.*

---

[1] Section 112(b) was formerly referred to as paragraph 2 of § 112.

[2] Section 112(f) was formerly referred to as paragraph 6 of § 112.

5

*Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1007 (Fed. Cir. 2021).  Next, a court looks at the specification of the patent to see what structure, if any, is disclosed that corresponds to the claimed function.  *See id.*  If no corresponding structure is sufficiently disclosed, then the means-plus-function term is deemed indefinite.  *See id.*

ON24, however, disputes webinar's claim that the term at issue – "communication manager object" – is a means-plus-function term.  Whether a claim is in fact a means-plus-function claim is also a legal question.  *See Williamson v. Citix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015).  A court presumes that a claim limitation is subject to § 112(f) – *i.e.*, is a means-plus-function term – "when the claim language includes the term 'means.'"  *Dyfan LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022).  "The inverse is also true – we presume that a claim limitation is *not* [a means-plus-function term] in the absence of the term 'means.'"  *Id.* (emphasis added).

This presumption, however, "is rebuttable.  The presumption can be overcome if a challenger [here, webinar] demonstrates that the claim term 'fails to "recite sufficiently definite structure."'"  *Id.*  The Federal Circuit has explained that

> "[n]once words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means,'" and can invoke § 112[(f)].  We have emphasized that "the essential inquiry is not merely the presence or absence of the word 'means,' but *whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure*."  "What is important is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art."
>
> Intrinsic evidence, such as the claims themselves and the prosecution history, can be informative in determining whether the disputed claim language recites sufficiently definite structure or was intended to invoke § 112[(f)].  In addition, because this inquiry turns on the understanding of a person of ordinary skill in the art, we often look to extrinsic evidence when determining whether a disputed limitation would have connoted structure to a person of ordinary skill.

*Id.* (emphasis added); *see also Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) (repeating that the "essential inquiry remains 'whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for

6

structure'").

C.     Whether "Communication Manager Object" Is a Means-Plus-Function Term

In the case at bar, the term "communication manager object" does not use the word "means." Therefore, there is a presumption that the term is not a means-plus-function term. According to ON24, the specification of the '480 patent, combined with a declaration from its expert Walter Overby, also establish that a communication manager object has a particular structure.

As a practical matter, the Court focuses on the Overby declaration because his declaration discusses the language used in the specification; the basic issue is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Dyfan*, 28 F.4th at 1365.

The Overby declaration sufficiently demonstrates that the broader term "object" would be understood by a person of ordinary skill in the art to be a structure of some kind. Mr. Overby explains that a person of ordinary skill in the art would understand that the term "object" means a "particular type of software structure with specific characteristics." Overby Decl. ¶ 7; *see also* Overby Decl. ¶ 9 ("'An object resembles an autonomous unit in that it has capabilities and may be asked to perform services by other units.'") (emphasis omitted). "By 2010, in object-oriented programming or coding, such as what is addressed in the '480 patent, 'object' meant a software construct that has state, exhibits some well-defined behavior, and has a unique identity."[3] Overby Decl. ¶ 11; *see also* Overby Decl., Ex. C (Encyclopedia Britannica online) (defining "object-oriented programming"; stating that "[o]bject-oriented languages help to manage complexity in large programs," and "[o]bjects package data and the operations on them so that only the operations are publicly accessible and internal details of the data structures are hidden"). Furthermore, as Mr. Overby points out, there is some language in the specification indicating that the term "object" reflects a structure. *See* '480 patent, col. 6:62-7:1 ("The innovations herein may

---

[3] In Exhibit D to the Overby declaration, there is a lengthy excerpt about objects from a publication titled *Object-Oriented Analysis and Design with Applications* (3d ed). Mr. Overby, however, seems to rely on this exhibit only for the proposition that there are three aspects of a software object: state, behavior, and identity. *See* Overby Decl. ¶ 12.

United States District Court
Northern District of California

1   be described in the general context of computer-executable instructions, such as program modules,

2   being executed by a computer, computing component, etc.  In general, program modules may

3   include routines, programs, *objects*, components, data structures, and such that perform particular

4   tasks or implement particular abstract data types.") (emphasis added).

5        But just because a person of ordinary skill in the art would understand the broader term

6   "object" to mean a structure of some kind, that is not the end of the inquiry.  The term at issue here

7   is not simply "object," but the phrase "communication manager object."  Mr. Overby does not

8   claim anywhere in his declaration that this specific term has a commonly understood meaning,

9   other than that it is some kind of software.  *Cf. Rain*, 989 F.3d at 1006 (noting that the parties did

10  "not dispute that 'user identification module' has no commonly understood meaning and is not

11  generally viewed by one skilled in the art to connote a particular structure").

12        At the hearing, ON24 seemed to suggest that it is enough for a person of skill in the art to

13  recognize that a communication manager object is software of some kind – *i.e.*, that fact alone

14  means that there is sufficient structure such that the term is *not* a means-plus-function term.  The

15  Court does not agree.

16        In this regard, *Dyfan* is a particularly instructive case.  In *Dyfan*, the patents at issue (which

17  shared the same specification) "describe[d] improved systems for delivering messages to users

18  based on their locations.  For example, the shared specification discloses a communications

19  system that provides users with information tailored to their particular interests or needs based on

20  their presence within a specified location. . . ."  *Dyfan*, 28 F.4th at 1362.  A representative claim in

21  one of the patents referred to a "system" comprised of multiple elements, including "code"

22  configured to perform certain functions when executed.  *See id.* at 1363.  The issue before the

23  Federal Circuit was whether "code"/"application" was a means-plus-function term.

24        The court noted first that "structure can be recited in various ways, including through the

25  use of 'a claim term with a structural definition that is either provided in the specification or

26  generally known in the art,' or a description of the claim limitation's operation and 'how the

27  function is achieved in the context of the invention.'"  *Id.* at 1366.

28        It then noted that, because the term "code"/"application" did not include the word

"means," there was a presumption that the term was not a means-plus-function term. "To overcome this presumption, [the defendant] had to show, by a preponderance of the evidence, that persons or ordinary skill in the art would not have understood the 'code'/'application' limitations to connote structure in light of the claim as a whole." *Id.* at 1367.

The Federal Circuit ultimately held that the defendant failed to overcome this presumption. It pointed out there was unrebutted testimony from the defendant's own expert that a person of ordinary skill in the art would have understood the term "application" as a particular structure. "More specifically, [the defense expert] Dr. Goldberg testified that the term 'application' would have been commonly understood to mean a 'computer program intended to provide some service to a user,' *and that developers could have, at the relevant time, selected existing 'off-the-shelf software' to perform specific services and functions*." *Id.* (emphasis added). Similarly, the defense expert testified that "a person of ordinary skill would understand that 'code' is 'a bunch of software instructions'" *and that* "*a person of ordinary skill would have known that the claimed function of displaying information could be implemented using 'off-the-shelf' code or applications*." *Id.* at 1368 (emphasis added). "[I]n view of Dr. Goldberg's unrebutted testimony that 'code' and 'application' would have connoted structure to a person of ordinary skill *and* given the availability of off-the-shelf code to perform the recited claim functions," the Federal Circuit rejected the defendant's contention that "code"/"application" was a means-plus-function term. *Id.* (emphasis added).

> Unlike in the mechanical arts, the specific structure of software code and applications is partly defined by its function. *Apple*, 757 F.3d at 1298-99. In determining whether software limitations like those at issue here recite sufficient structure, we can look beyond the initial "code" or "application" term to the functional language to see if a person of ordinary skill would have understood the claim limitation as a whole to connote sufficiently definite structure. *Zeroclick*, 891 F.3d at 1008 (concluding that the disputed terms are used "not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional . . . code, existing in prior art at the time of the inventions."); *Linear Tech.*, 379 F.3d at 1320 ("[W]hen the structure-connoting term . . . is coupled with a description of the [term's] operations, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112[(f)] presumptively will not apply."); *Apple*, 757 F.3d at 1298-99. *Dr. Goldberg explained that here, "code" and "application" (which themselves connote structure) in combination with the*

9

> *recitation of the code or application's operation would have connoted structure to persons of ordinary skill.*
>
> Reviewing the alleged means-plus-function limitation in full, the claim requires code configured to be implemented on a mobile device to display information via a display of the mobile device, receive information (including location-relevant information) via a wireless communications protocol, and display visual information based on the received location-relevant information after certain conditions are met. See J.A. 906 (Goldberg Dep. 140:23-141:13). *Dr. Goldberg testified that persons of ordinary skill in the art would have known of off-the-shelf code and applications for displaying any desired information. . . . Accordingly, because the recited functions can be performed by conventional off-the-shelf software, a person of ordinary skill in the art would have understood the alleged means-plus-function "code" limitations in the asserted claims to connote structure.*

*Id.* at 1368-69 (emphasis added); *see also Zeroclick*, 891 F.3d at 1008 (concluding that "a person of ordinary skill in the art could reasonably determine from the claim language that the words 'program' . . . and 'user interface code' . . . are not used as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional graphical user interface programs or code, existing in prior art at the time of the inventions").

   As indicated above, the *Dyfan* court did not hold that "application" and "code" had sufficient structure (and thus were not means-plus-function terms) because both terms were understood to be software or computer programs. Rather, the Federal Circuit also considered what function the software provided *and how that function would be carried out*, *i.e.*, through off-the-shelf code available at the time. *Cf. Sisvel Int'l S.A. v. Sierra Wireless, Inc.*, No. 2022-1493, 2023 U.S. App. LEXIS 26590, at *26 (Fed. Cir. Oct. 6, 2023) (stating that, "for a means-plus-function limitation where the corresponding structure is an algorithm, the specification need not disclose *all* the details of the algorithm to satisfy the definiteness requirement of § 112 ¶ 2," but "what is disclosed [should] be sufficiently definite to a skilled artisan") (emphasis added). It was because of this additional information that the court could conclude that there was no "'black box recitation[] of structure.'"[4] *Dyfan*, 28 F.4th at 1368; *see also Takadu Ltd. v. Innovyze LLC*, No. 21-291-RGA, 2023 U.S. Dist. LEXIS 45115, at *21-23 (D. Del. Mar. 17, 2023) ("agree[ing] with

---

[4] *See* note 7, *infra*.

1 Defendant that 'analysis engine' is a means-plus-function limitation"; "[t]he parties agree that an

2 'engine' in this context refers to a program or part of a program to perform a function or manages

3 data," but "[t]he term 'analysis' does not add sufficient structure to take the term out of §

4 112[(f)][:] Defendant's expert states that a POSA 'would not have been familiar with a specific

5 combination of software and/or hardware referred to as an "analysis engine,"'" and "Plaintiff's

6 expert does not state that the term is commonly used to connote structure nor that the term is used

7 to reference conventional programs that a POSA would recognize as an 'analysis engine'");

8 *Western DI Identity Sec. LLC v. Apple, Inc.*, No. 1:22-CV-58-LY, 2022 U.S. Dist. LEXIS 199275,

9 at *12-14 (W.D. Tex. Nov. 2, 2022) (underscoring that the patent did not simply recite to an

10 "algorithm" but rather an "encryption" or "encoding" algorithm specifically, and plaintiff provided

11 "extrinsic evidence from technical dictionaries, government publications, and other publicly

12 disclosed sources showing that the claim language references 'conventional' or 'off-the-shelf'

13 encryption or encoding algorithms known to persons of ordinary skill in the art at the time of

14 invention").

15     In his declaration, Mr. Overby maintains: "One of skill in the art would understand the

16 phrase 'communication manager object' in the '480 patent to correspond to a particular set of

17 functions, which is fleshed out specifically in at least two places in the '480 patent, but also

18 generally in the entirety of the disclosure and how the inventors described their invention as a

19 whole." Overby Decl. ¶ 17. The problem with this statement is that it simply conveys what the

20 function of a communication object manner is[5]; it does not shed any light as to how that

---

[5] *See, e.g.*, '480 patent, col. 4:24-48 (stating, *inter alia*, stating that the communication manager object "registers events or requests from individual components, identifies the priority of each event, and determines the callback mechanism to deliver information back to the calling component"; it also "applies a layer of security filters to verify that the calling component has the appropriate permissions to access the resources it is requesting, and that it has not exceeded its quota of requests within a given time frame," and, "[o]nce all these filters are passed and the Communications Manager determines that the event or method being called can in fact be acted on – the event or method is allowed to proceed in a metered and organized way"); '480 patent, claim 1 (providing, *inter alia*, that "the application framework receives and executes at least two communications components and a presentation component within the application framework using the communication manager object"; that "each component exchanges data with the communication manager object within the application framework"; and that "the communication manager object manages interface and display of the presentation via the application framework").

11

functionality is achieved. *See also* Overby Decl. ¶ 21 (testifying that the communication object manager "manages the two components [*i.e.*, the presentation component and the communications component] so they work seamlessly on the application"); *cf. Sisvel*, 2023 U.S. App. LEXIS 26590, at *18-19, 27-29 (indicating that, where software protocols are mentioned by name in a specification, whether those protocols constitute sufficient specific structure must be considered from the perspective of a skilled artisan).

In his declaration, Mr. Overby also asserts that the '480 patent "lay out what this object does, *how it does it*, and with what other components it interacts." Overby Decl. ¶ 18 (emphasis added). But Mr. Overby does not convey the "how." For example, he contends that "the claims themselves show how the pieces of this invention interact," Overby Decl. ¶ 22, but the Federal Circuit has indicated that this kind of information is not enough to show how a function is achieved. *See Rain*, 989 F.3d at 1006 (noting that, in a prior Federal Circuit decision, "we held that the written description of a 'copyright compliance mechanism,' *including how it was connected to various parts of the system*, how it functioned, and its potential functional components, was not enough to provide sufficient structure to the claimed 'compliance mechanism'") (emphasis added). As another example, Mr. Overby claims that the patent "provide[s] an algorithm or structure for the Communication Manager Object, which would allow one of skill in the art to understand how to code the object, given that the steps to or functions of the algorithm are sufficiently definite such that one of skill in the art would be expected to be able to code for them." Overby Decl. ¶ 24. But the Overby declaration does not go on to pinpoint what the steps of the algorithm are. Therefore, there is simply a black box recitation of structure as there was in *Dyfan*. In contrast to *Dyfan*, Mr. Overby does not point to or even suggest that the communication manager object is an off-the-shelf object or software known in the field. ON24's argument is particularly problematic given that, apparently, the claimed novelty in the '480 patent *is* in fact the communication manager object.[6]

ON24 protests still that the PTAB did not have "difficulties in construing" the term

---

[6] At the hearing, webinar asserted that the communication manager object is the claimed novelty of the '480 patent; ON24 did not disagree.

12

1  "communication manager object" during an inter partes review which was instigated by webinar

2  against ON24.  Overby Decl. ¶ 27 (adding that the PTAB concluded a communication manager

3  object exchanges data with the communication components).  The problem with this statement is

4  that the PTAB simply defined the word in terms of its functionality.  Moreover, on inter partes

5  review, invalidity based on indefiniteness technically cannot be raised.  *See Molo Design, Ltd. v.*

6  *Chanel, Inc.*, No. 21-CV-01578 (VEC), 2022 U.S. Dist. LEXIS 79480, at *13 (S.D.N.Y. May 2,

7  2022) ("Petitioners before the PTAB may only seek to cancel patent claims 'on a ground that

8  could be raised under section 102 [novelty] or 103 [non-obvious subject matter] and only on the

9  basis of prior art consisting of patents or printed publications.'  All other claims relating to the

10 validity of a patent are outside the scope of inter partes review, including claims of

11 indefiniteness.").

12       Accordingly, for the reasons stated above, the Court concludes that the term

13 "communication manager object" is a means-plus-function term.  webinar has successfully

14 rebutted the presumption that the term is not a means-plus-function term.

15 D.    Indefiniteness

16       Having concluded that "communication manager object" is a means-plus-function term,

17 the Court now turns to whether there is an indefiniteness problem.

> The first step in construing a means-plus function claim is to "identify the claimed function."  After identifying the function, we then "determine what structure, if any, disclosed in the specification corresponds to the claimed function."  "Under this second step, structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."

22 *Rain*, 989 F.3d at 1007.  As discussed below, where the function is software performed by a

23 general-purpose computer or microprocessor, the specification must disclose more.

24       In *Rain*, the Federal Circuit considered the term "user identification module."  It noted that,

25 at step one, there was no dispute that "the function of 'user identification module' is 'to control

26 access to one or more software application packages to which the user has a subscription.'"  *Id.*

27 As for step two, the structure in the specification that was linked with the function of controlling

28 access was, as the lower court found, computer-readable media or storage devices (*e.g.*, a SIM

13

1  card, IC card, flash memory drive, memory card, CD-ROM) which "amount[ed] to nothing more

2  than a general purpose computer." *Id.* The Federal Circuit then explained, where "the function is

3  performed by a general-purpose computer or microprocessor, the second step generally further

4  requires that the specification disclose the algorithm that the computer performs to accomplish that

5  function." *Id.*

> "[C]ontrol[ling] access to one or more software application packages to which the user has a subscription" requires more "than merely plugging in a general purpose computer." Rather, some special programming, *i.e.*, an algorithm, would be required to control access to the software application packages. . . . Under these circumstances, where a general purposes computer is the corresponding structure and it is not capable of performing the controlling access function absent specialized software, an algorithm is required.
>
> Nothing in the claim language or the written description provides an algorithm to achieve the "control access" function of the "user identification module." . . . Without an algorithm to achieve the "control access" function, we hold the term "user identification module" lacks sufficient structure and renders the claims indefinite.

*Id.* at 1007-08.[7]

*Rain* is consistent with earlier Federal Circuit case authority holding that, "when a patentee invokes means-plus-function claiming to recite a *software* function, it accedes to the reciprocal obligation of disclosing a sufficient algorithm as corresponding structure." *EON Corp. IP*

---

[7] The Court notes that indefiniteness and enablement are distinct and different inquiries. *Compare Nautilus*, 572 U.S. at 901 (stating that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention"); *with Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 (Fed. Cir. 2006) (noting that, "[i]n order to enable the claims of a patent pursuant to § 112, the patent specification must teach those of ordinary skill in the art 'how to make and use the full scope of the claimed invention without undue experimentation'"). That being said, the indefiniteness issue here (*i.e.*, a means-plus-function term that involves a general-purpose computer or software) is similar to the issue of enablement. *See Haddad v. United States*, 164 Fed. Cl. 28, 67-68 (2023) (noting that "enablement and indefiniteness may conceptually overlap," but adding that "the legal standards are distinct" and "lack of enablement and lack of written description[] are not proper to address during claim construction"); *cf. ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190 EDL, 2002 U.S. Dist. LEXIS 15348, at *44-45 (N.D. Cal. Aug. 15, 2002) (stating that, "[if a person of ordinary skill in the art can determine what the claim language means, but the specification does not show how to perform the invention, the claim may be invalid for lack of enablement, not for indefiniteness[;] [b]ecause analysis of enablement focuses on the adequacy of the specification in teaching a person of ordinary skill in the art how to make and use the invention, it cannot be considered to be part of claim construction").

14

1  *Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015) (emphasis added; also
2  noting that "[a] microprocessor or general purpose computer lends sufficient structure only to
3  basic functions of a microprocessor" but "[a]ll other computer-implemented functions require
4  disclosure of an algorithm"); *see also Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1318
5  (Fed. Cir. 2013) (stating that "[i]t is well settled that '[s]imply disclosing software, . . . "without
6  providing some detail about the means to accomplish the function[,] is not enough"'); *Noah Sys.,*
7  *Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1313 (Fed. Cir. 2012) (stating that, "while '[i]t is certainly true
8  that the sufficiency of the disclosure of algorithmic structure must be judged in light of what one
9  of ordinary skill in the art would understand the disclosure to impart,' in a situation in which the
10 specification discloses no algorithm, '[t]hat principle . . . has no application'").

11       In *Function Media*, the Federal Circuit noted that the "'specification can express the
12 algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow
13 chart, or in any other manner that provides sufficient structure.'" *Function Media*, 708 F.3d at
14 1318. That being said, an algorithm is not sufficient if all that is does is simply state functionality
15 without explaining *how* the function is performed. *See Blackboard, Inc. v. Desire2Learn, Inc.*,
16 574 F.3d 1371, 1384 (Fed. Cir. 2009) (stating that a sentence on which the plaintiff relied "merely
17 states that the access control manager enables different types of users to interact with the system in
18 a manner that preserves confidentiality (i.e., it works as intended)"; the "language 'simply
19 describes the function to be performed'" and "says nothing about how the access control manager
20 ensures that those functions are performed," and, "[as]s such, the language 'describes an outcome,
21 *not a means for achieving that outcome*'") (emphasis added).

22       In the instant case, the Court accepts, for purposes of this order, that the function of a
23 communication manager object is to exchange data with the communication components (as found
24 the PTAB during the inter partes review proceeding). *See also* Overby Decl. ¶ 27 (noting that the
25 PTAB concluded a communication manager object exchanges data with the communication
26 components). Nothing in the specification suggests this function is accomplished by anything
27 other than software performed by a general-purpose computer or microprocessor. The critical
28 question then is whether the '480 patent specification provides an algorithm as to how that

15

function is achieved. The patent does not. The patent simply states functionality without explaining how the function is performed. *See, e.g.*, note 4, *supra*.

The Court, therefore, concludes that the means-plus-function term "communication manager object" is indefinite and, accordingly, the '480 patent is invalid even under the clear-and-convincing standard.[8]

### III. CONCLUSION

For the foregoing reasons, the Court grants webinar's motion for partial summary judgment on the claim for patent infringement.

This order disposes of Docket No. 70.

**IT IS SO ORDERED**.

Dated: October 16, 2023

EDWARD M. CHEN
United States District Judge

---

[8] All independent claims of the '480 patent contain the term "communication manager object."

16